ERIE RAILROAD COMPANY, PROSECUTOR, v. BOARD OF PUBLIC UTILITY COMMISSIONERS AND CITY OF PATERSON.

Argued December 22, 23 and 24, 1915—Decided June 23, 1916.

1. The act of 1913 (*Pamph. L., p.* 91), known as the Fielder Grade Crossing act, is not confined in its operation to a single crossing, but in a proper case may include one or more crossings in the same petition.
2. The Supreme Court, upon *certiorari,* or under section 38 of the act of 1911 (*Pamph. L., p.* 374), can review the action of the board of public utility commissioners in ordering an alteration of the grade of a highway with a steam railroad, for the purpose of ascertaining whether or not such order is purely arbitrary; whether or not it has a reasonable basis to rest upon; whether or not it is supported to any extent by the facts submitted to the board for its consideration.
3. The evidence in the record is sufficient to support the findings of the board that such crossings are dangerous to public safety or the public travel is impeded, being the jurisdictional facts.
4. *Quære.* Upon the review of such an order, can additional testimony be taken under the provisions of the *Certiorari* act?
5. The word "impede" in this statute means to place obstructions in the way of; obstruct; hinder; as, to impede progress. It is synonymous with check, hinder, delay.
6. The Erie Railroad Company, as the lessee of the Paterson and Hudson River Railroad Company and the Paterson and Ramapo Railroad Company, is "the company operating such railroad" within the meaning of the statute. The order of the board of public utility commissioners was properly directed against the prosecutor, the Erie Railroad Company. The dangerous conditions, to the elimination of which the act is directed, are the result of the operation of the railroad by the Erie Railroad Company.
7. The statute provides the board of public utility commissioners "*may*" order the company operating such railroad, &c., to alter the crossing. As to the prosecutor, the statute is mandatory. The prosecutor is not concerned with what might happen to someone else. When, in a statute, the word "may" means must or shall.
8. Where the work is in itself a reasonable, proper and fair exaction, when considered with reference to the object to be obtained, the expense is not a reason against its legality, when the order for such work is based upon and made in an exercise of the police power, which is a part of the reserved power of the state.

9. The Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57) authorizes the public utility board, in a proper case, to order a railroad company to alter grade crossings according to plans to be approved by the board, by substituting therefor crossings not at grade, either by carrying the highway under or over the railroad, or by reconstructing the railroad under or over the highway, or by vacating, relocating or changing the lines, width, direction or location of the highway and the opening of a new highway in the place of the one vacated, and this includes the power to order such changes in the property and facilities of the railroad company as are fairly incidental to, or rendered necessary by, the alteration of the crossings.

10. An order of the public utility board made pursuant to the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), which is confined in its direction to the railroad company to the alteration of the crossings by changing the highways and by reconstructing the railroad, and by performing such work as is required thereby, does not require the company to make changes in private sidings and the like, not its property, and not within the limits of the right of way.

11. Where an order of the public utility board for the elimination of grade crossings under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57) is confined in its direction to the railroad company to the alteration of the crossings by changing the highways and by reconstructing the railroad and by performing such work as is required thereby, a change in the location of a station building not fairly incidental to, nor rendered necessary by, the changing of the highways or the reconstruction of the railroad, is not required by such order.

12. An order of the public utility board for the elimination of grade crossings under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), which is confined in its directions to the railroad company to the alteration of the crossings by changing the highways and by reconstructing the railroad and by performing such work as is required thereby, does not require the construction by the railroad company of structures upon its lands for the use of private parties in substitution for structures now occupied by them as lessees, and which will be rendered useless by the elimination work.

13. Where the order of the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57) for the elimination of grade crossings directs the street railway company to pay ten per centum of the expense of the changes required by the order directly chargeable to the crossings used by it, that being the maximum amount allowed by the statute, the steam railroad company cannot complain that the street railway company was not ordered to pay more.

14. An order made by the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), requiring the railroad company to make changes in the existing and remaining streets in respect to grade, width and structure, and to make other changes by the

abolition of existing crossings and the substitution of other crossings therefor on new highways, is not invalid by reason of such requirements, it appearing that such changes are all fairly incidental to, and were rendered necessary by, the separation of grades, having reference to the interests of the railroad company as well as those of all the people who have occasion to cross the railroad.

15. Section 13 of the General Railroad act, as amended by *Pamph. L.* 1914, *p.* 490, confers upon a railroad company power to take by condemnation any land or property required for the purpose of complying with an order made by the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), and the owners of property to be taken have no right to be made parties to, or to demand a hearing in, the proceedings under the Fielder act.

16. The provisions of the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57) are applicable alike to highways existing at the time of the construction of the railroad and to highways subsequently laid out.

17. An order made by the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), requiring the railroad company to make changes in the highways outside of its right of way at its own expense, is valid in respect to such requirement, it appearing that such changes are fairly incidental to the changes ordered in the crossings at the railroad.

18. The Supreme Court, upon review by *certiorari* of an order of the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57), will not disturb the action of the board in adopting plans of its own rather than those suggested by the railroad company, unless such action was unreasonable, or based upon some illegal principle, or lacks evidential support.

19. The fact that an order made by the public utility board under the Fielder act (*Pamph. L.* 1913, *p.* 91, *ch.* 57) makes no provision for such modification of the details of the plans as may become necessary during the progress of the work, is no reason for setting aside the order. There is a reasonable presumption in favor of the plans adopted, and the board may at any time, for good reasons, properly modify its order.

20. Statutory requirements enacted by the legislature for public safety under the police power of the state are not a taking of private property for public use without just compensation, although conformity to such requirements involves expense.

21. Railroad corporations may in the exercise of the police power by the legislature be required at their own expense not only to abolish grade crossings that existed when the railroad was constructed, but also to carry their tracks over highways laid out since the construction of the railroad or to carry such highways over their tracks; and the expense of such permanent improvement of the railroad property may be imposed by the legislature upon the railroad corporation operating such railroad without violating any constitutional provision.

22. A statutory requirement for the abolition of grade crossings is neither unconstitutional or unreasonable because it does not affirmatively authorize the railroad company to lessen or eliminate the danger at such crossing by decreasing the number of its train movements.

23. The object of a law must, by force of the constitution, be single and be expressed in its title; but the methods of attaining such object and the matters relating thereto, which may be as various as such object requires, need be expressed in the terms of the enactment only.

24. Any contract that a railroad corporation is empowered by the state to enter into is made subject to the future exercise by the state of its police power; and hence the obligations of such contracts are not in a constitutional sense impaired by such future legislation.

25. A state statute requiring the elimination of dangerous grade crossings is an exercise of the police power that is within the scope of the local law, and is not an interference with interstate commerce in the present state of federal legislation upon that subject.

26. The supplement to "An act concerning public utilities," approved March 12th, 1913 (Fielder act), is not an invasion of the exclusive jurisdiction of the Court of Chancery to regulate conflicting public easements.

27. The Fielder act does not impair the *mandamus* power of the Supreme Court.

On *certiorari,* &c.

There are two writs of *certiorari* in this case. The first was allowed on June 16th, 1915, for the purpose of reviewing an order of the board of public utility commissioners, dated April 20th, 1915. The second writ was allowed on July 22d, 1915, for the purpose of reviewing an order of the said board, dated July 9th, 1915, denying the petition for a rehearing of the previous order. The order under review was made, by virtue of the alleged power and authority vested in the said board by the statute (*Pamph. L.* 1913, *p.* 91), known as the Fielder Grade Crossing act, which is a supplement to the act creating a board of public utility commissioners and prescribing its duties and powers. The records of both writs, with the writs allowed seven other prosecutors, for convenience, have been included in the record of the proceedings under the first writ allowed. The prosecutor, the Erie Railroad Company, is ordered to alter fifteen grade crossings, in the city of Paterson,

by changing the grade of the streets and reconstructing the steam railroad according to the plan and profile annexed thereto; by substituting therefor crossings not at the grade of the public highways known as Madison avenue, Straight street, Clay street, Market street, Ellison street, Van Houten street, Broadway, Fair street, Hamilton avenue, Lafayette street, Franklin street, Keen street, Warren street, Putnam street and River street. The order further directs any telegraph, telephone company, &c., whose property or construction it may be necessary to change or remove, in order to carry said plan and order into effect, to change or remove the same, according to said plan. The Erie Railroad Company, the city of Paterson and all other parties are ordered to proceed with due diligence to the execution of the order and comply with all the requirements thereof. It was ordered that the work shall be begun on or before August 1st, 1916, and be completed within eight years, from April 20th, 1915; that it be prosecuted in accordance with a single plan, but in four separate divisions, marked A, B, C and D. Section A provides for the elimination of the crossings at Market street, Ellison street, Van Houten street, Broadway, Fair street, Hamilton avenue, Lafayette street and Franklin street. Section B provides for the elimination of the crossings at Keen street, Warren street and River street. Section C provides for the elimination of the crossings at Straight street and Clay street. Section D provides for the elimination of the crossing at Madison avenue, according to a plan submitted by the Erie Railroad Company, known as *Exhibit R 105*, at an estimated cost of $192,133.92 less than the plan prepared by the city and which carries Madison avenue over the tracks of the railroad. River street and Madison avenue are at the two extreme points. Measured along the railroad, the distance is about ten thousand eight hundred feet, or, substantially, two miles. Market street, in section A, is practically in the centre of the city of Paterson, and is the most traveled of all the streets mentioned in the order. From Market street to Madison avenue, at the southerly end of the work, is about six thousand feet, and to River street, at the other, or northern

end, it is about four thousand eight hundred feet. From Market to Clay and Straight streets, in section C, it is about three thousand feet. From Market street to Ellison street, in the same section, it is six hundred feet, to Van Houten street, three hundred and fifty feet farther on, to Broadway, three hundred feet more, Fair street, two hundred and fifty feet, and Hamilton avenue, two hundred and fifty feet, all in the same section, and from Market street to Keen street, in section B, about four thousand feet, and to River street about four thousand eight hundred feet, the most northerly end of the work, thus considering all the crossings mentioned in the petition in one comprehensive plan or scheme.

The order states the time in which each section is to be completed, commencing with section A, in which Market street is included. The Public Service Railway Company, operating trolley lines over three of the crossings, viz., Park avenue and Market street, one crossing, Broadway and River street, is charged with ten per centum of the cost of the alterations, including damages to adjacent property, directly chargeable to the alteration of those crossings used by the trolley company.

The statute provides the board *may* order the company operating the railroad to alter the crossing, and the entire expense of such alterations, including damage to adjacent property, shall be paid by such railroad, unless a street railway uses such crossing, in which event, an amount of such cost, not exceeding ten per centum of such expense directly chargeable to the crossing used by the street railway company, is to be paid by such company. The estimated cost of the alteration of the crossings is $2,948,218, for what is called plan No. 2, the one adopted by the board. This does not include damage to adjacent property. The amount of such damage, due to changing grades of streets, estimated at $168,500; the amount due to revision of buildings and sidings off the railroad right of way, estimated at $131,922.

The jurisdiction of the board is derived from the provision of the statute, which provides that "whenever a public highway and a railroad cross each other at the same level and it

shall appear to the board that such crossing is dangerous to public safety or that public travel on such highway is impeded thereby, the board of public utility commissioners may order the company operating such railroad" to alter such crossing according to plans to be approved by said board. The order was based upon proceedings initiated by the board of finance of the city of Paterson, being the board directed in the statute to file a petition, in writing, for that purpose, in which the facts are stated, upon which the relief under the act is sought. In the petition, it is recited that the Erie Railroad Company operates said railroad by virtue of a lease from two separate railroad companies, viz., the Paterson and Hudson River Railroad Company and the Paterson and Ramapo Railroad Company. Certain facts relating to each of the fifteen crossings are alleged, and prays, that the said railroad should be elevated to pass over said highways. A time and place were fixed for hearings, notice of which was given to the corporations therein named. Answers were filed. Testimony was taken before the board, commencing on the 17th day of October, 1912, and lasting until February 5th, 1915—eighteen hearings in all.

From the testimony it appeared that some of the streets mentioned in the petition were laid out after the railroad was built. The charters of the lessor companies (*Pamph. L.* 1831, *p.* 24, § 9; *Pamph. L.* 1841, *p.* 97, § 11) provide and impose a duty upon the said railroads to construct and keep in repair good and sufficient bridges or passages over and under said railroads or roads, where any public or other road shall cross the same, so that the passage of carriages, horses and cattle on said road shall not be "prevented" thereby.

The findings of the board were made in a report dated January 11th, 1915, which recites the facts on which the order was made, dated April 20th, 1915. The board found and determined the crossing of each of the streets involved in the proceeding to be dangerous to public safety and that public travel on such highways is impeded thereby. The board also found that the consideration of the entire subject is simplified by the acquiescence of all parties to the proceed-

ing, and that all the crossings mentioned in the petition must be considered in any plan of elimination. It was not questioned but that a general plan for the separation of grades at the crossings was practicable. There was a difference of opinion between the engineers as to details, but the chief objection raised was to the expense.

Then, on February 5th, 1915, a petition for a further hearing was filed by the Erie Railroad Company, and on April 20th, 1915, the same date as the order, a report by the board was made denying a further hearing, in which it is stated, as to the reduction of train movements, that the company was afforded every opportunity to furnish such proof, if it had any, and did not avail itself of such opportunity; in addition, the offer on this score was so indefinite that it did not appear reasonable to delay the proceedings for that purpose. Then writs of *certiorari* were obtained by the Erie Railroad Company, Public Service Railway Company, Passaic Water Company, Western Union Telegraph Company, D. Fullerton & Company, Meyer & De Vogel, Fuller's Express Company and Morris & Company.

On June 15th, 1915, a petition for a rehearing was filed by the Erie Railroad Company, and testimony thereunder was taken June 28th, 1915, by the board. On July 9th, 1915, a report was made by the board denying the application for a rehearing. On July 22d, 1915, a *certiorari* was obtained by the Erie Railroad Company to review this report, determination or order, and on the 27th of September, 1915, an order was obtained from a justice of the Supreme Court granting leave to take affidavits on two days' notice. Such affidavits or depositions were taken on the part of the Erie Railroad Company before a Supreme Court examiner on September 30th, 1915. Many reasons have been filed by each of the prosecutors why the order of April 20th, 1915, should not be set aside. The reasons of all the prosecutors are substantially included within the seventy-eight reasons filed by the Erie Railroad Company and their amendments, except when the facts specially apply to a particular prosecutor. Under the *certiorari* obtained by the Erie Railroad Company to re-

view the order denying a rehearing, the Erie Railroad Company has filed six separate reasons why that order should be set aside. Under section 38 of the Public Utility act of 1911, page 374, the Supreme Court is given jurisdiction, by petition, to review the order of the board and to set aside such order when it clearly appears that there was no evidence before the board to support reasonably such order, or that the same was without the jurisdiction of the board, or the order of the board may be reviewed by *certiorari* in appropriate cases.

All the points made by the counsel for the prosecutor are covered in the opinion of the court. To facilitate reference thereto, the numbering employed by the counsel for the prosecutor, the Erie Railroad Company, will be adopted in the opinion and adhered to throughout.

The writs of *certiorari,* other than those prosecuted by the Erie Railroad Company, will be disposed of in separate memoranda or opinions.

Before Justices GARRISON, TRENCHARD and BLACK.

For the prosecutor, *Gilbert Collins, George S. Hobart, Duane E. Minard* and *Herbert A. Taylor* (of the New York bar).

For the Board of Public Utility Commissioners, *Frank H. Sommer.*

For the city of Paterson and Board of Finance of said city, *Edward F. Merrey.*

The opinion of the court was delivered as follows:

I. The first ground of attack made by the prosecutor, the Erie Railroad Company, is on the construction of the statute. It is contended that the words, "such crossing," "a crossing," "the crossing," in the statute, indicate that it was the intention of the legislature to have only one crossing considered in any one proceeding. The petition of the city of Paterson prays for, and the order of the board of

public utility commissioners provides for, the separation or alteration of fifteen separate crossings. The board in its report determined that at each of the crossings involved, a condition exists such as was designed to be remedied by the statute. The question then arises as to whether it is practicable and feasible to alter such crossing.

The board further found that the entire subject is simplified by the acquiescence of all parties to the proceedings, that all of the crossings mentioned in the petition must be considered in any plan of elimination. There was no intimation from anyone that a change of a particular crossing only should be considered. It was not questioned but that a general plan for the alteration of grades at the crossings was practicable. The question then is: What was the legislative intent? The board having found the jurisdictional facts, which will be considered hereafter, does the statute limit the board to the alteration of a single crossing in a separate proceeding, or can two or more crossings, or a group of crossings, that are dangerous to public safety, or that impede public travel on such highways, and which are connected or related to one another, so that an alteration in the one necessarily makes an alteration in the other, be considered by the board under the statute, in a single proceeding, and a single plan be made for their alteration? It may be observed, in the first place, the statute does not expressly or inferentially prohibit such a proceeding, and second, if a restricted construction be placed upon the statute, the effect will be, as shown by this record, to leave those crossings in the cities of the state, where the greatest use is made of the highways, at the railroad crossings, and presumptively, where the greatest danger is, intact and not subject to alteration. No substantial reason is stated for limiting the construction of the statute to a single crossing, in a separate proceeding, excluding a group of crossings, where the record shows that much of the testimony applicable to one is applicable to all. The plan of alteration applicable to one, as a practical and engineering problem, is so intimately connected with all that it involves all the crossings, except, perhaps, Madison avenue

in section D, which will be considered hereafter. The record discloses no valid reason for so construing and limiting the operation of the statute. True, we are not concerned with the reasonableness or unreasonableness of the statute. Our duty is to find the intention expressed by the legislature and to give it effect. If a separate plan of alteration of each crossing and a separate proceeding is requisite, it would make it wholly impossible to alter any of the crossings, from a practical point of view, since the alteration of the several crossings must, as is conceded, proceed under a general plan. Such a purpose should not be attributed to the legislature, when the statute will reasonably admit of a different construction. In determining the meaning of a statute, the courts will keep in mind the circumstances surrounding its enactment and the objects sought to be obtained by the statute. *Alton, &c., Railroad Co.* v. *Vandalia, &c., Railroad Co.,* 268 *Ill.* 75; *Warner* v. *King,* 267 *Id.* 87. This being a remedial statute, it should receive a liberal, rather than a narrow, construction. As was said by Mr. Justice Dixon, speaking for the Court of Errors and Appeals, in reference to the first grade crossing statute, passed by the legislature (*Pamph. L.* 1874, *p.* 45) : "The avowed object of these statutes is highly beneficent, and, therefore, its provisions tending towards the accomplishment of that object should be liberally construed." *Read* v. *City of Camden,* 54 *N. J. L.* 347, at 373. Subsequently this language was cited with approval, by that court, in the case of *Morris Dredging Co.* v. *Jersey City,* 64 *Id.* 587, 590.

The prosecutor does not point out, or even attempt to show, how or in what way, fifteen separate petitions, with fifteen separate hearings, would be more advantageous to it, but on the contrary, rather acquiesces in the idea that all the crossings mentioned in the petition must be considered in one plan of alteration, if alteration is to be made at all, and that a general plan of the alteration of the grades at the several crossings is practical as an engineering problem.

Mr. Brameld, the engineer of the prosecutor, the Erie Railroad Company, at page 509 of the record, testified, "There

are various changes which I think will have to be made."
At page 526, "Of course, I haven't worked up the detailed
solution of every one of them, but from my general knowledge
of the situation, I think they could be taken care of," i. e.,
the details.    The testimony further shows that section D
provides for the elimination of the crossing at Madison avenue,
according to a plan submitted by the prosecutor, the Erie
Railroad Company, known as *Exhibit R 105*, which is an
estimated cost of $192,133.92, less than the plan prepared by
the city, and which carries Madison avenue over the tracks
of the railroad, instead of under the tracks.    We think the
construction of the statute cannot be limited to a single
crossing in a separate proceeding, but in a proper case, where
the jurisdictional facts appear, several crossings may be con-
sidered in one proceeding, when so related to one another,
that the consideration of the one necessarily involves the con-
sideration of the other as a practical engineering problem.

The next ground of attack is that the evidence taken before
the board of public utility commissioners does not justify,
nor reasonably support the board's conclusion or findings.
To that end, the insistence is, that this court has power and
should review the board's findings of fact.  We understand
such to be the power of this court.  The rule on this point
is stated thus, by Chief Justice Gummere, speaking for the
Court of Errors and Appeals, in the case of *West Jersey,
&c., Railroad Co.* v. *Board of Public Utility Commissioners,* 87
*N. J. L.* 170; 94 *Atl. Rep.* 60: "That court (*i. e.*, the Supreme
Court) can upon *certiorari*, or under the statutory procedure
provided by section 38 of the act of 1911 (page 374), review
such action for the purpose of ascertaining whether or not
it is purely arbitrary, whether or not it has a reasonable
basis to rest upon, whether or not it is supported to any
extent by the facts submitted to the board for its considera-
tion; and if it shall be made to appear to the court that
such action is purely arbitrary, or that it has no reasonable
basis upon which to rest, or is unsupported by the facts laid
before the board, the court may declare it null and void, and
order it to be set aside.  So, too, if the board refuses to con-

sider the matter at all, the court by *mandamus* can compel it to do so." *Public Service Gas Co.* v. *Board of Public Utility Commissioners,* 84 *N. J. L.* 463; 87 *Id.* 581; 95 *Atl. Rep.* 127; *Erie Railroad Co.* v. *Board of Public Utility Commissioners,* 87 *N. J. L.* 139; 95 *Atl. Rep.* 177.

Our reading of the record shows that a mass of testimony was presented to the board, particularly with reference to the various elements of danger and the impediments to travel, at all of the level crossings of the highways, such as a list of accidents, at some of the crossings; obstructions to the view of persons traveling along the highways in both directions; a series of photographs, made and produced by the railroad company, showing the obstructions to the view at each crossing; delays to travel in general; the fact that at the crossings where there are trolley tracks every street car is stopped, near the railroad crossing, until the conductor goes over it on foot and releases a derail switch; schedules made at different times as to the number of persons, vehicles drawn by horses, automobiles, bicycles and trolley cars passing over such crossings in a given period; testimony that the crossings were protected by gates and automatic bells; the number of trains and drill locomotives passing over the crossings within a given time; operations of gates, &c., from which the board found the facts, in its report, that each of the crossings was dangerous to public safety, and we think after reading the evidence, the conclusion of the board is supported by the facts that were before it. The question is one of fact to be determined according to the circumstances of each case. *Mayor, &c., of Newark* v. *Erie Railroad Co.,* 75 *N. J. Eq.* 20. This applies to both conditions called for in the statute, viz., that such crossings are dangerous to public safety, or the public travel on such highways is impeded. This, at the same time, disposes of the prosecutor's contention that the evidence as to one crossing cannot be extended to include other crossings, or that non-dangerous crossings cannot be ordered to be eliminated at the expense of the prosecutor, the Erie Railroad Company. This also was considered under point I.

In this connection may be considered point 22 of the brief of the prosecutor, the Erie Railroad Company. It is there urged that the prosecutor had the right to take additional testimony under the provisions of the *Certiorari* act. Such testimony was taken before a Supreme Court examiner and returned with the record, but as the prosecutor says, to use the words of the brief, the point is perhaps of comparatively small importance in the present case, for the reason that the affidavits and exhibits served but to explain the evidence and exhibits that were already in evidence. This renders it unnecessary to further consider this point. See, *Dubelbeiss* v. *Town of West Hoboken*, 82 *N. J. L.* 683.

But it is further urged, that the word "impede" has a well recognized meaning, having been used in many of the earlier charters of the railroad companies. The argument is that the obvious purpose of those statutes was to make the surface of the railroad ties and rails conform to the surface of the highway at a railroad crossing; that the rails and ties, as they passed the highway, would impede travel, and if the railroad happened to be constructed in a cut or on an embankment, the impediment to travel would thereby be increased; that the word "impede" refers to permanent physical obstructions due to the grade and construction of the railroad tracks, citing *North Manheim Twp. (Supreme Court, Pa.)*, 14 *Atl. Rep.* 137, and that the highway crossings are to be so constructed and maintained as not to unreasonably obstruct the use of the crossings by highway travelers. This is too narrow. The dictionary definition of the word "impede" is to place obstructions in the way of; obstruct; hinder; as, to impede progress. It is synonymous with check, hinder, delay.

The evidence in the record shows the public travel is impeded, in this sense, at each of these crossings, and the board so found. The word "prevent" is used in the early charters of the lessors of the prosecutor in place of the word "impede."

It is quite evident the rule, as to negligence and contributory negligence at grade crossings, as laid down by the courts, cannot be used as a guide in construing this statute, because

in these cases the statute requires the railroad company only to ring a bell or blow a whistle, under normal conditions, on the approach of a train to a grade crossing, at a distance of nine hundred feet. Then, too, there is a well-recognized distinction between actions, where the interest of the general public at crossings is involved and those which assert the rights of individuals who are injured. *Palmyra* v. *Pennsylvania Railroad Co.*, 62 *N. J. Eq.* 601.

II. The next ground of attack is that the order, under the statute, should have been directed to the two original chartered railroad companies, construing the words of the statute, "the company operating such railroad" to mean, the company which is charged with the legal duty of operating, or at least, that the order should have been directed to the prosecutor and the said two companies jointly, so that the expenses of altering the grades might be apportioned among all the companies in accordance with their several interests. The original companies are the Paterson and Hudson River Railroad Company, organized under *Pamph. L.* 1831, *p.* 24, and the Paterson and Ramapo Railroad Company, organized under *Pamph. L.* 1841, *p.* 97. They were leased by two separate leases, each dated September 9th, 1852, to a company known as the "Union Railroad Company." These leases were declared legal and valid by the legislature, March 14th, 1853. *Pamph. L., p.* 480. This validating act speaks of the corporation or individuals *using* the aforesaid roads. By various assignments, foreclosures, proceedings and sales, the Erie Railroad Company, the present prosecutor, on November 14th, 1895, acquired title to all the property and rights of the two lessor companies. As stated above, the statute provides (section 1 of the act, *Pamph. L.* 1913, *p.* 91) that, "the company operating such railroad" and the expense (section 2), "shall be paid by such railroad, * * * the balance to be paid by the company operating such railroad."

On behalf of the two original companies, it is insisted that they do not directly or indirectly institute, direct or control any of the operations upon these respective roads, nor is the duty of operating such roads charged upon them by law.

The lease of the Paterson and Hudson River Railroad Company provides, "and that at the termination of the leases or either of them, any erections or improvements on the said above mentioned and demised property that may have been made by the parties of the second part, or their assigns, at their own expense, shall be paid for by the parties of the first part, at their appraised and just value." The lease of the Paterson and Ramapo Railroad Company has a like provision, but in different language. Both leases provide that the erections and improvements shall be valued by arbitrators, and the party of the first part shall pay and discharge the amount so valued to the parties of the second part or their assigns. Both leases, however, provide that "the parties of the second part do hereby covenant and agree with the parties of the first part, that the said parties of the second part, and their assigns, will keep and maintain and run said railroad and other premises hereby demised, in such manner, order and condition, as the said parties of the first part are bound to keep and maintain and run the same by the charter of the said parties of the first part, and the statutes supplementary thereto, and that they will indemnify and save harmless the said parties of the first part from all damages to which they may be subject by reason of said road and premises not being so kept, maintained and run." The prosecutor, in paragraph three of its answer, admits that it operates a railroad running through the city of Paterson.

The legislature's intention on this point is not obscure. Apt and precise words are used to express that intention, and, taken in connection with the provisions of the leases and the validating act of the legislature above referred to, the intention of the legislature cannot be misunderstood.

There is no reason why the courts should not give to the words used by the legislature their plain, natural meaning, viz., that power or instrument which puts in action and supervises the workings of the plant, the Erie Railroad Company, as being "the company operating such railroad." The dangerous conditions, to the elimination of which the act is directed, are the result of the operation of the railroad, by the

Erie Railroad Company, against whom the order is directed in accordance with the plain terms of the statute.

III. The next ground of attack is based upon that clause of the statute which provides that the board *may* order the company operating such railroad to alter the crossing. The insistence is, if the statute is construed to confer on the board arbitrary power to order or refuse to order the alteration of the grade crossings, in its discretion, the statute is invalid. It is conceded that the board could constitutionally be delegated power to determine whether or not certain facts exist, but when such facts have been found, it is urged the statute then leaves it to the board to decide arbitrarily whether it will or will not make an order for the alteration of the crossings.

The obvious answer to this point of the prosecutor is the fact that the prosecutor was required by the order to make the alterations and changes in the grades, so, as to it, the statute is mandatory, and if the facts before the board justify the order, it is not arbitrary. The prosecutor is not concerned with what might be ordered to be done by someone else, by the board of public utility commissioners.

There is a line of authorities, however, which hold that *"may"* in a statute means must or shall. Thus, in England, in the case of *King* v. *Barlow, 2 Salk.* 609, it was said that the word "may" in a statute shall be taken to be mandatory, where the thing to be done is for the sake of justice or the public good. So, Chancellor Kent, in the case of *Newburgh Turnpike Co.* v. *Miller, 5 Johns. Ch.* 113, said, in respect to statutes, the rule of construction seems to be that the word "may" means must or shall only in cases where the public interests and rights are concerned, and where the public or third persons have a claim, *de jure,* that the power shall be exercised. These cases were cited with approval by our courts in the cases of *Davison* v. *Davison,* 17 *N. J. L.* 169; *Seiple* v. *Borough of Elizabeth,* 27 *Id.* 407; *Atlantic City Water Works Co.* v. *Read,* 50 *Id.* 665. So, there is a line of authorities which hold that the agencies of government do not act automatically. It is necessary to vest in its officers certain general powers with a discretion in the governmental agents as to

their exercise. It would be as impracticable, as it is undesirable, to attempt to formulate in advance a set of hard and fast rules by which every conceivable public act should be governed. In order to accomplish the ends of local government, it has been found expedient to create various boards and commissions, which are charged with the duty of supervising, directing and controlling particular subjects. It has been held that the granting of such power by the legislature was not a grant of either legislative or judicial power. *People* v. *Roth,* 249 *Ill.* 532. For other illustrative cases see *In re Connecticut Company (Conn.),* 94 *Atl. Rep.* 992; *In the Matter of New York Elevated Railroad Co.,* 70 *N. Y.* 327; *Trustees of Saratoga Springs* v. *Saratoga Gas, &c., Co.,* 191 *Id.* 123; *Alton, &c., Railroad Co.* v. *Vandalia, &c., Railroad Co.,* 268 *Ill.* 68.

It is further urged that if the court should hold the statute valid, still the order in the present case should be set aside, for the reason that it is insisted the evidence shows without dispute that the prosecutor has not, and in all reasonable probability will not have, sufficient funds for the purpose of meeting the cost of complying with the order. The determination of this question is one of fact, in the first instance, devolving upon the board of public utility commissioners. The board had before it the financial history of the Erie Railroad Company, its indebtedness, its income and many other details bearing upon the finances of the company, and from this evidence the board found adversely to the prosecutor, the Erie Railroad Company. After a careful reading of the voluminous testimony on this point, we are unable to say that the board's determination is without sufficient facts to support its conclusion. The prosecutor has eight years in which to comply with the order of the board and do the work. Where the work is in itself a reasonable, proper and fair exaction, when considered with reference to the object to be attained, the expense is not a reason against its legality (*Health Department of the City of New York* v. *Rector, &c., of Trinity Church,* 145 *N. Y.* 32; 27 *L. R. A.* 710; *Woodruff* v. *New York, &c., Railroad Co.,* 59 *Conn.* 63), the order

being based upon and made in an exercise of the police power, which is a part of the reserve power of the state.

Point VIII. is, that the order of the board is invalid, in so far as it requires the prosecutor to make changes in switches, side tracks, leads, bridges, yards, structures and other facilities and property of the prosecutor and of other companies, co-partnerships or individuals.

We think in this respect the order properly interpreted is justified by the statute properly construed.

The statute authorizes the board, in a proper case, to order the railroad to alter grade crossings according to plans to be approved by the board, by substituting therefor crossings not at grade, either by carrying the highway under or over the railroad, or by reconstructing the railroad under or over the highway, or by vacating, relocating or changing the lines, width, direction or location of the highway and the opening of a new highway in the place of the one vacated, and this includes the power to order such changes in the property and facilities of the railroad company as are fairly incidental to, or rendered necessary by, the alteration of the crossings.

Now, the order of the board directs the railroad company "to alter such crossings, and each of them, according to the plan therefor annexed to and made part hereof * * * and profile of same, also annexed to and made part hereof, * * * which said plan and profile are hereby approved; by substituting therefor crossings not at the grade of the public highways known as Madison avenue, Straight street, Clay street, Market street and Park avenue, Ellison street, Van Houten street, Broadway, Fair street, Hamilton avenue, Lafayette street, Keen street, Warren street, Putnam and River streets; by changing the lines, width and direction thereof and carrying so much thereof as so changed under the said railroad, except in the case of Madison avenue, which is carried over the railroad, according to and as shown on said plan and profile for said purpose, and by vacating the remaining parts of said highways within the lines of the right of way of said railroad company, and further, by vacating that part of Madison avenue lying west of the railroad which is included

between the right-of-way line of the railroad and the line of the relocated Madison avenue; by substituting for the existing crossings at Cedar street a crossing under the railroad· at Taylor street, and for the existing crossing at Franklin street a crossing under the railroad at Montgomery street, and also by widening and altering the existing highways known as Essex street, Governor street and Fulton street, adjusting the structures spanning them to the proposed grade or grades (which said new highways shall be located, and of the width, length and direction and carried over or under the said railroad where so indicated); by reconstructing said railroad and highways and by performing all· other work required according to and as shown on the said plan and profile."

It, therefore, appears, we think, that the order is confined in its direction to the company to the alteration of the crossings in question by changing the highways and by reconstructing the railroad and by performing such work as is required thereby. It does not require the railroad company to make changes in private sidings, and the like, not its property, and not within the limits of its right of way. The closing words of the order, "and by performing all other work required according to and as shown on said plan and profile," do not affect this conclusion as to the scope of the order. These general words follow specific provisions of the order, and under an elementary rule of construction are limited thereby. Further, they refer back to the introductory general mandate of the order requiring the company to "alter said crossings, and each of them," and are limited thereby.

Neither does the order require the owners of such private sidings to reconstruct them. The plan which accompanies the order simply suggests to such owners a method by which their property may be conformed to the new conditions so as to admit of a continuance of the siding facilities theretofore enjoyed. The order only requires others than the railroad company to make such changes in, and removals of, their property and construction as are necessary to carry the order and plan into effect. In this it accords with section 4 of the statute. Since the mandate of the order to the rail-

road company is limited to requiring the changing of highways and the reconstruction of the railroad, the changes in, or removal of, such private sidings cannot be said to be necessary to carry the order to the railroad into effect. Of course, the plan does indicate a way in which, in part, existing siding facilities may be continued after the ordered changes in the highways and the ordered reconstruction of the railroad are made. It is appropriate that it should do so, for, in the adoption of a plan, the effect thereof in existing industrial facilities should be taken into account, and this factor should also be taken into consideration in determining whether the plan adopted is reasonable or unreasonable.

As we have pointed out, in so far as the order directs the prosecutor to make changes in its own side tracks, and the like, it was within the power conferred by the statute if such changes were fairly incidental to the changes of grade of the main line tracks. We think that such ordered changes were of that character.

Point IX. is, that the order is invalid, in so far as it requires changes in the construction and location of the station building at Market street and the station building at River street.

We think this point is not well founded in fact.

The order (leaving out of account the plan and profile) does not require any change in the construction or location of these station buildings. It does not deal with them. The plan and profile do display reconstructed stations at new nearby locations. If these changes are fairly incidental to the changing of the highways or the reconstruction of the railroad, they are deemed to be a part of the order and must be made. That some reconstruction of both stations is rendered necessary by the reconstruction of the railroad, and will have to be made some time, either according to the judgment of the railroad managers or as may be lawfully directed by the public utility board, is not questioned. But it is contended that the change in the location of the stations was not fairly incidental to the changing of the highways or the reconstruction of the railroad. If so, the reconstruction of the

stations at new locations is not required by the present order. Upon full consideration we think that is so. We do not find that the change in the location of the stations was incidental to, or rendered necessary by, the elimination of the grade crossings. Accordingly, we hold that the order under review does not require the railroad company to reconstruct these station buildings at the new locations as indicated and suggested upon the plan. No doubt, section 17 (*b*) of the Public Utility act (*Pamph. L.* 1911, *p.* 379), conferring upon the board power, "after hearing upon notice," to require a public utility "to furnish safe, adequate and proper service and to keep and maintain its property and equipments in such condition as to enable it to do so," is ample to authorize the board, in a proper case, to order the relocation of a railroad station. But this was not a proceeding under that section. Aside from the fact that such relocation was not ordered, it will be noticed that such changes were not asked for in the petition. There was no hearing and no evidence upon the question whether the existing stations at these points were safe, adequate and proper, nor was any notice given to the prosecutor that such question was to be passed upon by the board in this proceeding, other than such as might be inferred from the "suggestion" of the city engineer that such changes might be desirable if the tracks were elevated.

Point X. is, that the order is invalid, in so far as it requires the prosecutor to construct structures upon its lands for the use of Fuller's Express Company and Morris & Company, in substitution for the structures now occupied by them as lessees and which will be rendered useless by the elimination work.

It is true that the plan adopted by the board has indicated upon it suggested possible locations upon the lands of the railroad company of substituted structures for these private companies, but it does not require the railroad company to provide such 'locations or to erect such structures, since neither the existing structures nor the suggested structures constitute any part of the railroad. This matter is sufficiently discussed under point VIII.

Point XI. is, that the statute and order, in so far as they permit or require the prosecutor to make certain changes in the properties of the Public Service Railway Company, and in so far as they limit the proportion of the expense of the alterations in certain of the grade crossings to be paid by the street railway using the same, are unconstitutional and invalid.

The alleged unconstitutionality of the imposition by section 2 of the statute of not exceeding ten per centum of the cost directly chargeable to the elimination of the grade crossings used by the street railway upon that company, is dealt with elsewhere in this opinion.

The contention that the order is invalid, in that it requires the prosecutor to do the physical work of removing and changing the property of the Public Service Railway Company, is not well founded in fact. The order does not require the prosecutor to do that. It requires the Public Service Railway Company to change and remove such of its property and construction as is necessary to carry into effect the order, and further directs that both the prosecutor and the Public Service Railway Company keep specific and complete records of the expenses directly chargeable to the crossings, and each of them, so used by such street railway company.

The order directs the Public Service Railway Company to pay ten per centum of the expenses of the changes required by the order directly chargeable to the crossings used by it. This was the maximum amount allowed by the statute and, of course, the prosecutor cannot complain that it was so limited.

Point XII. is, that the statute and order are unconstitutional and invalid, in so far as they permit or require the prosecutor to make changes in the existing streets with respect to grade, width and structure, and to make other changes by the abolition of existing crossings and the substitution of other crossings therefor on new highways.

We have elsewhere herein indicated that the statute in this respect violates no constitutional provision. We also think

that the order in this respect is within the powers conferred by the statute. The changes required in respect to the grade and width and structure in existing highways which remain, and those requiring the abolition of existing crossings (and the substitution of other crossings) therefor on new highways, are all fairly incidental to, and were rendered necessary by, the separation of grades, having reference to the interests of the railroad company as well as those of all the people who have occasion to cross the railroads. Being so regarded, it is valid. *In re Selectmen of Norwood,* 161 *Mass.* 259; 37 *N. E. Rep.* 199; *Davis* v. *County Commissioners of Hamshire County,* 153 *Mass.* 218; 26 *N. E. Rep.* 848.

In so far as the execution of such order may require the exercise of the power of eminent domain, it will be seen that section 13 of the General Railroad act as now amended (*Pamph. L.* 1914, *p.* 490), confers upon the railroad company power to take by condemnation any land and property required for the purpose of complying with any order made by the board of public utility commissioners. It will also be noticed that the owners of property to be taken have no right to be made parties to, or to demand a hearing in, this proceeding. *In re Directors of Old Colony Railroad Co.,* 163 *Mass.* 356; 40 *N. E. Rep.* 198. It is also to be noticed in this connection that, under the charter of the city of Paterson, the city has ample power to lay out, open, change, alter or vacate the streets involved, and to take such lands and real estate as may be necessary therefor. *Pamph. L.* 1871, *p.* 846, § 92; *Pamph. L.* 1907, *p.* 114; *Pamph. L.* 1910, *p.* 524; *Pamph. L.* 1911, *p.* 179. Under this latter act the board of public works of Paterson has power to vacate streets. *Sherwood* v. *City of Paterson,* 88 *N. J. L.* 456, 738. The order directs the railroad company, the city of Paterson and all other parties to proceed with due diligence to the execution of the order and to comply with all the requirements thereof. Of course, in carrying out its part of the order, the city of Paterson must act in conformity with its charter and the laws amending the same. *Clark* v. *City of Elizabeth,* 61 *N. J. L.* 565.

Point XIII. is, that the order in so far as it requires the prosecutor to reconstruct the railroad is invalid because not made in accordance with the statute; and that the statute is unconstitutional because it does not permit the public utility board to order the elimination of the grade crossings by depressing the highway in part or by elevating the railroad in part.

We think there is no merit in this contention for reasons elsewhere stated in this opinion.

Point XIV. is, that the order is invalid and the statute is unconstitutional in so far as they require the elimination of grade crossings of highways laid out after the railroad tracks were constructed.

There is no merit in this point. We have elsewhere sufficiently indicated that we think that such a requirement in a statute would not render it unconstitutional. Undoubtedly the statute in question applies alike to highways existing at the time of the construction of the railroad and to highways subsequently laid out. The order in the respect mentioned is therefore within the powers conferred by the statute. *Worcester, N. and Railroad Co.* v. *City of Nashua,* 63 *N. H.* 593; 4 *Atl. Rep.* 298; *New York and N. E. Railway Co.* v. *City of Waterbury,* 60 *Conn.* 1; 22 *Atl. Rep.* 439; *Northern Pacific Railway Co.* v. *State of Minnesota, ex rel. Duluth,* 208 *U. S.* 583.

Point XV. is, that the statute and order are unconstitutional and illegal in so far as they require the prosecutor to reconstruct highways outside of the right of way of the prosecutor at the crossings.

With respect to the suggestion that the statute is unconstitutional for such reason we have nothing to add to what we have elsewhere said.

With respect to the contention that the order is illegal in that it requires the railroad company to make changes in the highways outside of its right of way at its own expense, we say that it appears that such changes are fairly incidental to the changes in the crossings of the railroad and are therefore

proper. *In re Selectmen of Norwood, supra; Davis* v. *County Commissioners of Hamshire County, supra.*

Point XVII. is, that the order is unreasonable in that it requires the prosecutor to alter the crossings according to a plan which is more expensive to the prosecutor than is necessary for the purpose of removing the danger to public safety or the impediment to public travel.

The real complaint under this point is that the board refused to adopt certain modifications suggested by the prosecutor respecting the plans for the elimination of crossings at Keen, Warren and River streets, and for the consolidation of the crossings at Straight and Clay streets.

But we think that the propriety of the plan adopted by the board is amply supported by evidence. This court will not disturb such a finding unless it be unreasonable, or based upon some illegal principle, or lacks evidential support. *Public Service Railway Co.* v. *Public Utility Board,* 87 *N. J. L.* 250.

Point XVIII. is, that the order is unreasonable, in that (*a*) it arbitrarily limits the dates of the beginning and completion of the work; (*b*) it arbitrarily requires the work to be done in designated divisions and in the sequence of such divisions, and (*c*) it makes no provision for such changes or modification of details of the plan as may become necessary during the progress of the work.

With respect to the first two propositions we are clearly of the opinion that the times fixed, and the division of the work, are entirely reasonable and proper.

Passing now to the other complaint. The fact that the order makes no provision for such modifications of the details of the plans as may become necessary during the progress of the work, is no reason for setting it aside. There is a reasonable presumption in favor of the plan adopted by the board. *In re Selectmen of Westborough,* 169 *Mass.* 495; 48 *N. E. Rep.* 763. If, in the course of executing the order unforeseen contingencies arise, or details are found to require change or things required become unnecessary by reason of changed conditions, or for any other cause, the order made

and plan adopted by the board may be modified on application. Section 31 of the Public Utility act provides that the board may at any time modify an order made by it. *Pamph. L.* 1911, *p.* 386.

The constitutional objections argued by counsel for the prosecutor will be considered in the order in which the points are presented in his brief.

Point IV. That the statute is unconstitutional because it takes the property of the prosecutor as the lessee and operator of the railroads owned by the Paterson and Hudson Railroad Company and the Paterson and Ramapo Railroad Company for the private use and benefit of the said two companies, the respective owners of said railroads.

The argument is, that inasmuch as the order for grade crossing elimination calls for the permanent improvement at the expense of the operating lessee of the property owned by the lessors, the money of the lessee so expended is taken for the private use of the owners of the property so improved. Is this so in point of fact? The lease of the Paterson and Hudson River Railroad Company to the Union Railroad Company, made on September 9th, 1852, and assigned to the New York and Erie Railroad Company, contains the following provision: "And it is in like manner further agreed by and between the parties to these presents, that if any erections or improvements shall, during the said term hereby demised, or any future term, or terms hereafter demised, be made on said demised premises or appurtenant thereto, the same shall, at the termination of said term or terms, and the cessation of the interest of the parties of the second part of, in and to the same, by the expiration thereof, or other termination thereof, be valued by arbitrators, to be appointed in like manner as last above provided, and the award of a majority of such arbitrators shall be conclusive as to the value of the said erection and improvements; and the parties of the first part shall pay and discharge the amount so valued to the parties of the second part or their assigns."

The lease from the Paterson and Ramapo Railroad Company to the Union Railroad Company, and assigned to the

New York and Erie Railroad Company, contains a precisely similar covenant.

Such permanent erections or improvements and the moneys thereon expended are not therefore taken for the private use of the lessors in the sense contemplated by the constitution; upon the contrary, such improvements are to be used and enjoyed by the lessee during its term, and if taken at all by the lessor are to be paid for at their value, which may be greatly in excess of their cost. Such a prearranged purchase is not the taking of property *in invitum* that is reprobated by the constitutional provision on which the argument is based.

These same considerations apply also to the second contention made under this point in the brief, viz., that compliance with the order constitutes a confiscation of the property of the prosecutor, because of the cost of such compliance.

The broader ground, however, by which both of these contentions are met is that the provisions in question of the Fielder act constitute a regulation adopted by the legislature for public safety under the police power of the state, and hence are not a taking of private property without just compensation, although conformity to such regulation involves expense. This is the language of our Court of Last Resort, delivered by Mr. Justice Depue, in the case of *Morris and Essex Railroad Co.* v. *City of Orange,* 63 *N. J. L.* 252. This definitive statement and concrete application of the police power is sufficient authority for this court, in the present case, unless it be necessary that whenever the police power is mentioned an essay on the subject shall be delivered; on the contrary, it would seem that the proper way for a lower court to deal with an established rule of law was to treat it as established.

Inasmuch, however, as a federal question is involved, it may be well to quote from one of the most recent decisions of the Supreme Federal Court. In the case of *Chicago, Milwaukee and St. Paul Railway Co.* v. *Minneapolis,* 232 *U. S.* 430, Mr. Justice Hughes, delivering the opinion of the court, said:

"It is well settled that railroad corporations may be re-

quired, at their own expense, not only to abolish existing grade crossings, but also to build and maintain suitable bridges or viaducts to carry highways newly laid out over their tracks, or to carry their tracks over such highways." Citing a large number of cases in the state and federal courts.

Other specific illustrations of the application of this established rule to the elimination of grade crossings are: *Davis* v. *County Commissioners,* 153 *Mass.* 218; *N. Y. & N. E. R. R. Co.* v. *Bristol,* 151 *U. S.* 556; *In re Selectmen of Norwood,* 161 *Mass.* 259; *Illinois Central Railroad Co.* v. *Copiah County,* 81 *Miss.* 685; *City of Harriman* v. *Southern Railway Co.,* 111 *Tenn.* 538; *St. Louis and Santa Fe Railway Co.* v. *Fayetteville,* 75 *Ark.* 534; *C. B. & Q. Ry. Co.* v. *Drainage Commissioners,* 200 *U. S.* 561; *Cincinnati, I. & W. R. R. Co.* v. *Connersville,* 218 *Id.* 336; *Chicago, M. & St. Paul R. R. Co.* v. *Minneapolis,* 232 *Id.* 430; *Mo. & Pac. Ry. Co.* v. *Omaha,* 235 *Id.* 121.

Upon the point that these federal decisions, especially the two last cited, extend the rule of some of our earlier state decisions, it is to be remarked, first, that there is no conflict as to the fundamental doctrine of the police power but only as to its application, and secondly, that as to due process of law, and other matters involving ultimately a federal question, the decisions of state courts yield to those pronounced upon such questions by the supreme federal tribunal.

Point V. Which is, that the statute under review is unconstitutional because it deprives the prosecutor of its property without due process of law or just compensation, in that it requires the entire expense of abolishing the grade crossings to be paid by the prosecutor, is fully answered by what has just been said under the previous point. We have nothing to add excepting that the case of *New York and New England Railroad Co.* v. *Bristol,* 151 *U. S.* 556, on which counsel relies for his main argument, has been stripped of the force accorded to it by counsel by the more recent case of *Chicago, Milwaukee and St. Paul* v. *Minneapolis,* in 232 *U. S.*

The contention that the legislature could not lawfully limit the proportion of expense to be borne by the street railway

company to ten per cent. of the total expense of the alteration of a crossing is, of course, unsound if the entire expense might at the legislative will have been placed upon the prosecutor. The opposite contention, viz., that the imposition of any part of the expense upon the trolley company was unlawful is, of course, not now under consideration.

The same remark applies to the limitation of the expense imposed upon the municipality affected.

Under this point there is also a running attack made upon the principle of utility boards in general, involving their powers as well as their procedure, but as far as discoverable no constitutional limitation is pointed out or discussed. Under this subhead similar boards in other jurisdictions are described and the differences noted, but no constitutional question raised that is not covered, as far as we are able to do so, by the principles decided in the cases already cited.

Point VI. is, that "Said statute is unconstitutional and said order is unreasonable, for the reason that the prosecutor is not given the alternative of decreasing or eliminating the alleged danger to public safety and the alleged impediment to public travel by decreasing the number of train movements or by abandoning the railroad." In so far as this reason challenges the discretion exercised by the board in making its order we are not concerned with it in this part of our opinion; in so far as it constitutes an attack upon the statute the contention must be that the legislative act was unconstitutional because it did not affirmatively authorize the railroad company to decrease the number of its trains or to abandon its railroad.

The abandonment of the railroad was not germane to the object of the statute, and the power to deal with that question could not be delegated to the agency created by the act.

The decrease in the number of train movements was a matter primarily under the control of the prosecutor, and hence required no statutory permission; if by such decrease the danger and congestion at the crossings were in fact eliminated or reduced to a negligible point that fact would doubtlessly be recognized by the board and dealt with accordingly. It was

for the prosecutor to make that fact appear and its failure to do so involved no constitutional infirmity in the statute.

Point VII. is an attack upon the title of the original Public Utility act of 1911, and upon the duality of the objects alleged to be embraced in that act as supplemented by the Fielder act of 1913.

The title of the original act expresses broadly and inclusively the object of the statute; it does not express the means and methods of attaining that object, but this is not required. *Bumstead* v. *Govern,* 47 *N. J. L.* 368; *affirmed,* 48 *Id.* 612; *Hickman* v. *State,* 62 *Id.* 499; *affirmed,* 63 *Id.* 666.

As was said by this court in *Moore* v. *Burdett,* 62 *N. J. L.* 163, 164: "The object of a law must not be confused with its product. * * * The object of every law, by force of the constitution must be single and be expressed in the title of the law; the product may be as diverse as the object requires and finds its expression in the terms of the enactment only. In fine, the title of an act is a label not an index." The statute has, in a constitutional sense, a single object. To attain this object it enacts various methods and matters so related to such object and to each other as to effectuate a single purpose. The inclusion of such inter-related matters is not the intermixing of things that have no proper relation to each other, hence the statute as a whole has a single object. *Payne* v. *Mahon,* 44 *N. J. L.* 213; *Newark* v. *Mt. Pleasant Cemetery Company,* 58 *Id.* 168.

Point XVI. is, that "The statute and order violate the constitution of the United States in that they impair the obligation of the prosecutor's contracts as follows:

"(*a*) Contracts with the holders of the prosecutor's stocks, bonds, notes and other obligations.

"(*b*) Contracts between the State of New Jersey and the prosecutor or its predecessors in interest.

"(*c*) Contracts between the prosecutor or its predecessors and the Public Service Railway Company or its predecessors.

"(*d*) Contracts between the prosecutor and the various switch owners.

"(*e*) Contracts between the Paterson and Hudson River

Railroad Company and Ramapo Railroad Company, and the prosecutor or its predecessors."

These objections may be considered together, since, despite their apparent diversity, they rest upon a common principle and present but a single legal question, to wit, whether these contracts whenever made or upon whatever consideration based were subject to the future exercise by the state of its police power. The specific application of the general doctrine treated under point IV. to the obligation of contracts is well stated by Mr. Justice Depue in M. & E. Railroad Co. *v.* Orange, where after pointing out that certain New York and Connecticut decisions were placed upon the ground that the charters of the respective companies were subject to alteration or repeal, but that the opinion of the Connecticut court and of the Supreme Court of the United States in *New York and New England Railroad* v. *Bristol,* 62 *Conn.* 252; 26 *Atl. Rep.* 122; 151 *U. S.* 556, lays stress upon the fact that the regulations were a proper exercise of the police power of the state, he said: "In *Boston and Maine Railroad Co.* v. *County Commissioners,* 79 *Me.* 386; *S. C.,* 10 *Atl. Rep.* 113, an act requiring the expense of building and maintaining so much of the townway or highway as was within the limits of the highway where such way crossed the track at grade, should be borne by the railroad company, was held to be constitutional. This decision was made against a company whose charter provided that it should not be altered, amended or repealed. The power of the legislature to impose such burdens for general safety under the police power was declared to be fundamental and that the act did not impair any contract in the company's charter. Whether the corporation has an irrepealable contract in its charter or not is immaterial. Police powers are inherent in the government and the legitimate exercise of legislative power in securing public safety does not impair the obligation of contracts nor deprive anyone of property without due process of law." 63 *N. J. L.* 252, 264.

A later expression of the same thought by the Supreme Court of the United States speaking through Mr. Justice Day is as follows: "The exercise of the police power cannot be

limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contract rests, as it is beyond the authority of the state or the municipality to abrogate this power so necessary to public safety. *Chicago, Burl. & Q. Railroad Co.* v. *Nebraska,* 170 *U. S.* 57." *Northern Pacific Railway Co.* v. *Minnesota,* 208 *U. S.* 583.

Many of the cases cited under point IV. are to the same effect and sustain the same doctrine, the acceptance of which renders it unnecessary and indeed futile to follow the brief in its recapitulation of the hardships that result from the observance of such legal rule.

That the contracts of the railroad with others for switch connections and service were subject to the police power was held by the Court of Errors and Appeals in *Swift* v. *Delaware, Lackawanna and Western Railroad Co.,* 66 *N. J. Eq.* 34.

Cases in other jurisdictions are: *Branson* v. *Philadelphia,* 47 *Pa. St.* 329; *Kinealy* v. *St. Louis, Kansas City and Northern Railroad Co.,* 69 *Mo.* 658; *Otis Elevator Co.* v. *Chicago,* 263 *Ill.* 419.

As to the Public Utilities, the doctrine of their subservience to the police power is the same. *Jersey City* v. *City of Hudson,* 13 *N. J. Eq.* 420; *Stillwater Water Co.* v. *Stillwater,* 50 *Mo.* 498; *Detroit* v. *Fort Wayne and Elmwood Railway Co.,* 90 *Mich.* 646; *Columbus Gas and Coke Co.* v. *Columbus,* 50 *Ohio St.* 65; *Natick Gas Co.* v. *Natick,* 175 *Mass.* 246; *New England Telegraph and Telephone Co.* v. *Boston Terminal Co.,* 182 *Id.* 397; *New Orleans Gas Light Co.* v. *Drainage Commissioners,* 197 *U. S.* 453.

Point XIX. is, that "Said order imposes a burden upon the interstate traffic of the prosecutor and interferes with and impairs its operation to perform its duty as an interstate carrier of freight and passengers because:

"(a) It requires changes in the location or grade of switches, side tracks, leads, bridges, yards, structures and other facilities and properties of the prosecutor which are used by the prosecutor in the furtherance of its interstate business.

"(b) It compels the prosecutor to raise and expend moneys

for the purpose of complying with said order, which said moneys would otherwise be available for and would be used by the prosecutor in the making of changes and improvements which are essential for the purpose of enabling the prosecutor to carry on its interstate business."

Whether or not the police regulations of a state constitute an unlawful interference with interstate commerce is distinctly a question for the ultimate decision of the highest federal court. The attitude of that court upon this question is well expressed by Mr. Justice Gray, delivering the opinion of the court in the case of *Chicago, M. & St. P. R. R. Co.* v. *Solan, 169 U. S. 133, 137*:

"The rules prescribed for the construction of railroads and for their management and operation, designed to protect .persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and liability of those engaged in such commerce. So long as congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits."

So long as this attitude is maintained by the federal court the doctrine enunciated by it would gain nothing by our concurrence and suffer nothing by our dissent. We, however, not only recognize the authority but also concur in the soundness of the rule laid down.

Point XX. is, that "Said order is in violation of the constitution of the State of New Jersey and of the United States, in so far as it deprives the prosecutor of the rights, benefits, advantages, privileges and contracts now possessed by it with reference to the several leads, switches and side tracks which under said order are required to be destroyed or relocated and reconstructed, for the following reasons." Upon this point we can add nothing to what has already been said in discussing the scope and dominance of the police power.

Point XXI. is, that "Said order and the statute upon which same is based are in violation of the constitution of the State of New Jersey, because:

"(*a*) They impair the jurisdiction of the courts of equity of the State of New Jersey by depriving them of their jurisdiction over the regulation of the use of easements.

"(*b*) They impair the jurisdiction of the courts of law of the State of New Jersey by depriving them of their jurisdiction to compel the performance of the duties imposed by law upon the prosecutor or its predecessors in interest."

As to the alleged invasion of the exclusive jurisdiction of the Court of Chancery to regulate conflicting public easements, our decision might well rest upon the reasoning of the opinion of Mr. Justice Kalisch, in this court, in the case of *Erie Railroad Co.* v. *Board of Public Utility Commissioners,* 87 *N. J. L.* 438. In view, however, of the argument of counsel, and the attempt to distinguish that case from the present one, it will be as well to point out that there is an essential difference between the jurisdiction exercised by Chancery over conflicting public easements and the exertion by the legislature of its police power to avert danger at railway crossings. Under the inherent power of the Court of Equity all questions as to the existence, character, duration and priority of such conflicting easements, together with their respective paramountcy or subservience, as well as questions of acquiescence, estoppel, contribution and expense, are considered by the Court of Chancery, and are either adjudicated by it or are relegated to a court of law for decision, as the case may be; whereas, in the legislative exercise of its police power all of these matters are determined by the statute, leaving nothing of a judicial nature to be adjudicated by the statutory tribunal excepting the applicability of such legislative scheme to a given state of facts, if it be found to exist, and the determination thereupon of the practical methods of accomplishing the legislative object. This exercise by the legislature of its police power which, in its simplest expression, is illustrated in statutes requiring the erection of safety gates, the posting of flagmen and the giving of audible

signals, long antedated the adoption of the constitution of 1844, so that the jurisdiction of the Court of Chancery, that was confirmed by that instrument, was not exclusive in respect to the exercise of such powers by the legislature, even if the jurisdiction of equity at any time was or could be exclusive as to such exercises of this sovereign power, which is not for a moment admitted even for the purposes of argument.

In the case of *Palmyra* v. *Pennsylvania Railroad Co.,* 62 *N. J. Eq.* 601, the contention of the railroad was that powers of this nature were so essentially legislative that they could not constitutionally be exercised by the Court of Chancery under legislative authority, which is the precise opposite of the contention of the prosecutor in the present case. The truth is that neither extreme view is the proper one; the correct view being that the mixed administrative and *quasi*-judicial functions to be performed by the board of public utilities commissioners under the statute, which do not, in a constitutional sense, properly belong to either of the three great departments of government may, because of that circumstance, be lawfully exercised under express legislative authority by a statutory tribunal without infringing upon the constitution itself or upon the prerogatives of the Court of Chancery. This principle, although not this precise application of it, is illustrated in *Paul* v. *Gloucester County,* 50 *N. J. L.* 584; *Moreau* v. *Freeholders of Monmouth,* 68 *Id.* 480; *Ross* v. *Freeholders of Essex,* 69 *Id.* 291; *Iowa Life Insurance Co.* v. *Eastern Mutual Life Insurance Co.,* 64 *Id.* 340; *In the Matter of Drainage of Lands,* 35 *Id.* 497; *Palmyra* v. *Pennsylvania Railroad Co., supra; Eckert* v. *Perth Amboy and W. Railroad Co.,* 66 *N. J. Eq.* 437.

As to the alleged impairment of the *mandamus* power of this court, what has just been said as to the Court of Chancery, measurably covers this matter also, at least in principle.

There is, however, another doctrine peculiar to the prerogative writs of this court, viz., that stated by Mr. Justice Trenchard, in *Newark* v. *Kazinski,* 86 *N. J. L.* 59, to the effect that where this court may by its writ of *certiorari* supervise the action of a statutory tribunal, the fact that such

tribunal is exercising under legislative authority powers similar to or identical with those exercised by this court under its prerogative writs, is a negligible circumstance. The question is, however, almost, if not entirely, academic, since the functions exercised by the statutory board in this case do not bear the slightest resemblance to the *mandamus* function of this court.

We have now reviewed *seriatim* the points of constitutional law as presented in the elaborate brief of counsel for the prosecutor without finding that any of them requires us to declare invalid the statute of 1913 as a whole or as to any of its essential features. If any other constitutional question has been argued by counsel incidentally and outside of his stated points, it may upon that account have escaped our attention, but it will, nevertheless, we confidently believe, be found to be covered by the principles we have discussed and by the cases cited to illustrate them.

The conclusion that we have reached from the foregoing considerations of all of the reasons filed and argued by the prosecutor, is that each of the orders of the board of public utility commissioners, brought up by the two writs of *certiorari* in this case, should be affirmed, with costs.